IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Maritza Dominguez Braswell**

Civil Action No. 23–cv–03222–MDB

SHEREE LYNN,

    Plaintiff,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,

    Defendant.

# ORDER

This matter is before the Court on Defendant State Farm's partial Motion for Summary Judgment (["Motion"], Doc. No. 57.) Plaintiff Sheree Lynn responded in opposition (["Response"], Doc. No. 60), and State Farm replied in support (["Reply"], (Doc. No. 68.) Defendant reproduced all undisputed statements of fact in the Reply. (*See* Doc. No. 68 at 12-24.) On November 5, 2025, the Court heard oral argument regarding this Motion and the parties' outstanding Fed. R. Evid. 702 motions. The Court has reviewed the pleadings, arguments, and applicable law, and **ORDERS** that the Motion is **GRANTED** for the reasons set forth below.

Defendant also filed a Motion to Exclude Expert Stephen Strzelec Under Rule 702 (["Strzelec Motion"], Doc. No. 55), to which Plaintiff responded (Doc. No. 63) and Defendant

replied. (Doc. No. 71.) In light of the summary judgment ruling, the Strzelec Motion is **DENIED** as moot, without prejudice.[1]

## BACKGROUND

This matter arises out of a September 3, 2021, motor vehicle accident between Plaintiff Sheree Lynn and non-party Beth Merriman. The parties agree that Plaintiff has already received the $100,000 bodily injury liability limit available from Ms. Merriman's liability insurance carrier. (Doc. No. 57 at 2; *see* Doc. No. 68 at ¶ 2.)

On June 15, 2023, Plaintiff made a claim under her own State Farm insurance policy ("Policy") for underinsured motorist ("UIM") benefits. (Doc. No. 68 at ¶ 6.) The parties agree that after some initial communications, claims specialist Michael Dumong took unexpected leave and stopped responding to Plaintiff on or around July 4, 2023. (*Id.* at ¶ 9.) They also agree that between July 5 and July 24, 2023, Plaintiff repeatedly contacted State Farm for updates on the status of her UIM claim. (*Id.* at ¶¶ 11, 13.)

On July 27, 2023, State Farm Claim Specialist Amber Springer offered Plaintiff $1,500 for her UIM claim. (*Id.* at ¶ 20.) Ms. Springer "provided the following breakdown of the offer":

> Special Damages (Medical Bills Considered/Economic Loss): $63,822.23
> *this includes $40,551.23 in medical expenses and *23,271.00 in wage loss. No medical bills presented were discounted or not considered. The total above is the full amount of the bills received. General Damages/Non-Economic damages (i.e. Pain and Suffering, Inconvenience), and Physical Impairment and/or Disfigurement $37,677.77 Total: $101,500.00 Minus

---

[1] Mr. Strzelec appears to support the bad faith claims primarily, if not exclusively. If Plaintiff seeks to offer Mr. Strzelec to support the remaining claims, she must provide prompt notice of his narrowed opinions as set forth below. Relatedly, and with respect to Defendant's expert Steven Plitt, the Court intends to deny Plaintiff's Rule 702 challenge as moot, given Defendant's proffer that Mr. Plitt was retained to address only the bad faith opinions. However, the Court will issue the Plitt decision separately.

Underlying Bodily Injury Limits: -$100,000.00 Offer: $ 1,500.00.

(*Id.*) Plaintiff's attorney sent Ms. Springer a letter the following day disagreeing with the amount. (*Id.* at ¶ 22.) Plaintiff claimed State Farm improperly disregarded Dr. Eric Lang's report, which estimated Plaintiff's past and future lost wages at approximately $1.3 million. (*Id.* at ¶¶ 18, 22.) After that, Ms. Springer explained State Farm's calculation and offer, advising of concerns about the lack of supporting documentation for Plaintiff's lost earnings claim, and identifying certain disconnects in Dr. Lang's report. (*Id.* at ¶ 23.) Ms. Springer also explained "that, despite the minimal support for any wage loss claim directly related to the accident, State Farm included three months of wage loss in its offer to account for potential time off during the initial acute injury state and periodic time off for treatment . . . ." (*Id.* at ¶ 24.) Between August 4-9, Plaintiff provided additional tax and employment documentation, and then on August 14, 2023, Plaintiff filed this lawsuit. (*Id.* at ¶¶ 26-27.)

## LEGAL STANDARD

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but instead, must designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c).

"A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury," or conversely, whether the evidence "is so one-sided that one party must prevail as a matter of law." *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (1987) (quoting *Anderson*, 477 U.S. at 251-52). A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal−Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248). "Where the record taken as a whole could not lead a rational trier of fact to find for the [nonmovant], there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## ANALYSIS

Plaintiff makes several arguments in support of her bad faith claims. At a high level, they can be organized into three categories: (I) arguments concerning Defendant's $1,500 offer; (II) arguments concerning Defendant's post-UIM claim conduct; and (III) arguments concerning Defendant's pre-UIM claim conduct, which occurred between April and June of 2022. To support her arguments, Plaintiff relies on the expert report of Stephen Strzelec, State Farm's

internal policies, and the communications between the parties.[2] The Court considers each of Plaintiff's arguments in turn.

I.   **Defendant's $1,500 offer to Plaintiff**

Defendant offered Plaintiff $1,500 on July 27, 2023, which the parties agree was never paid. (Doc. No. 68 at ¶¶ 20 (agreeing on the amount and date of the offer), 57 (agreeing that "State Farm never paid the $1,500 to Ms. Lynn . . . .").) Plaintiff contends the $1,500 offer was an initial offer of UIM benefits, which State Farm was required to pay in accordance with its internal impasse payment policy and Colo. Rev. Stat. § 10-3-1115. (Doc. No. 60 at 6, 8.) Thus, Defendant's failure to pay it was unreasonable and in bad faith. For its part, Defendant characterizes the $1,500 as merely an offer to settle—not an admission it owed Plaintiff benefits. Thus, Defendant argues, the failure to pay does not constitute bad faith.

The Court must now resolve whether there is some genuine dispute of material fact on this issue, or whether the evidence that this was a settlement offer is so one-sided that no reasonable jury could conclude otherwise.

---

[2] Initially, Plaintiff also appeared to rely on the Unfair Claims Settlement Practices Act ("UCSPA"). (*See* Doc. No. 5 ¶¶ 88-91.) However, it appears she abandoned that argument in the Response. (*See* Doc. No. 60.) In any event, UCSPA violations are not *per se* evidence of bad faith because they are only relevant when they cause or contribute to unreasonable delay. Colo. Rev. Stat. § 10-3-1104(h); *see Baker v. Allied Prop. & Cas. Ins. Co*., 939 F. Supp. 2d 1091, 1108 (D. Colo.), *as amended* (June 12, 2013). Furthermore, mere citations to the UCSPA are insufficient to show that an insurer acted unreasonably. *See Bonbeck Parker, LLC v. Travelers Indemnity Corp. of America*, 611 F. Supp. 3d 1115 (D. Colo. 2020) (citations to the UCSPA and general case law do not provide enough information for a layperson to decide whether insurer's payment methodology was unreasonable). Plaintiff claimed that Defendant's conduct was unreasonable and willful under Colo. Rev. Stat. § 10-3-1104(1)(h)(III), (VI), (VII), (XIII), and (XIV). (Doc. No. 5 at ¶ 88.) But beyond these conclusory assertions, she offers no support or expert opinion explaining how these statutory provisions apply or how Defendant's conduct violated them. As such, those arguments effectively restate her other arguments, which the Court addresses separately.

First, the plain terms of State Farm's offer letter demonstrate the $1,500 was an offer to settle Plaintiff's UIM claim. (Doc. No. 57-13 at 1 ("Please accept this letter as an offer of settlement for Sheree Lynn's Underinsured Motorist Claim . . . ."); *Burnett v. State Farm Mut. Auto. Ins. Co.*, 2022 WL 12082668, at *5 (D. Colo. Oct. 4, 2022), *report and recommendation adopted*, 2022 WL 11732841 (D. Colo. Oct. 20, 2022) (in Colorado, a compromise settlement offer as to disputed benefits is a legal means of resolving a claim).) In that letter, Ms. Springer expressly disclaimed any admission of benefits owed. (Doc. No. 57-13 at 1 ("This offer is not an admission of what is owed."); Doc. No. 68 at ¶ 20.) Ms. Springer explained that State Farm calculated the settlement offer based on available documents, then invited Plaintiff to let her know if there was any new information to consider, or if State Farm had missed anything. (Doc. No. 68 at ¶¶ 19-20; *see* Doc. No. 57-13.) The language demonstrates that as of July 27, 2023, Defendant remained open to negotiation.

Second, the offer reflected compromise—a fundamental feature of negotiations. The uncontroverted evidence shows that the parties had a genuine and reasonable dispute over the value of Plaintiff's UIM claim, and specifically, the value of Plaintiff's lost wages following her accident. (*See* Doc. No. 68 ¶¶ 18-25.) Indeed, the gap between the parties was significant. Plaintiff asserted that her lost wages should be calculated according to Dr. Lang's report, which estimated approximately $1.3 million in lost wages, earning capacity, and household services. (*See* Doc. No. 57-16.) But according to Defendant, Plaintiff failed to submit proof that her decrease in income was attributable to the accident, and moreover, Plaintiff's medical records suggested she was still working after the accident. (Doc. No. 68 at ¶¶ 22-23; *see* Doc. No. 57-17.) Nevertheless, Defendant's $1,500 offer included three months of wage loss. (Doc. No. 68 at

6

¶ 23-25; Doc. No. 57-15 at 3; Doc. No. 57-17 at 1.) In other words, despite the contention that wage loss was not substantiated, Defendant's $1,500 offer incorporated some wage loss and clearly reflected Defendant's attempt to compromise.

Plaintiff asks this Court (and eventually a jury) to accept that because State Farm offered $1,500 for the claim, it *must* mean the claim is worth at least $1,500. Said another way, Plaintiff seeks to use the offer itself as evidence of the claim value. But under Colorado law, settlement offers and underlying evaluations may not be used to prove the value of a disputed claim. *See generally* Fed. R. Evid. 408(a) (prohibiting the use of a compromise settlement offer to prove the amount of a disputed claim); *Fear v. GEICO Cas. Co.*, 560 P.3d 974, 980 (Colo. 2024) (holding that Rule 408 extends to settlement evaluations in Colorado); *see also Albrandt v. State Farm*, 2021 WL 5140283, at *2 (D. Colo. 2021) (an insurer may withhold payment of disputed benefits, so long as it has a reasonable basis to withhold).

Plaintiff also argues that Defendant's decision to withhold payment violates its own internal policies and thus constitutes bad faith. (*See* Doc. No. 60 at 5; Doc. No. 60-4.) However, for both statutory and common law bad faith claims, the reasonableness of an insurer's conduct is measured by industry standards. *Schultz v. Geico*, 429 P.3d 844, 847 (Colo. 2018); *Williams v. Owners Ins. Co.*, 621 F. App'x 914, 919 (10th Cir. 2015). Courts look to expert testimony and state law for objective evidence of industry standards. *Baker*, 939 F. Supp. 2d at 1107; *Am. Fam. Mut. Ins. Co. v. Allen*, 102 P.3d 333, 343-44 (Colo. 2004). Internal policies may be relevant evidence when they are consistent with industry standards. *See generally U.S. Roller Works, Inc. v. State Auto Prop. & Cas. Ins. Co.*, 2018 WL 4095058, at *2 (M.D. Tenn. Aug. 28, 2018). But non-compliance with internal policies that *exceed* industry standards is not necessarily evidence

of bad faith. *See, e.g.*, *Hayas v. GEICO General Ins., Co.*, 2014 WL 5590808, at *9 (M.D. Fla. Nov. 3, 2014) (a company's failure to comply with internal policies which go "above and beyond" reasonable conduct may not be evidence of bad faith.)

Here, Plaintiff's expert, Mr. Strzelec, admits that State Farm's policies and practices often *exceed* industry standard. (Strzelec Depo., Doc. No. 55-2 at 3 ("In many cases, [State Farm's] standards are higher than the minimum standards in the industry.").) Mr. Strzelec specifically acknowledges that the payment policy at issue here goes beyond industry standards. (Strzelec Depo., Doc. No. 55-2 at 17-18.) Plaintiff also admits that some of Defendant's claims handling policies are "internal standards exceeding industry minimums." (Doc. No. 60 at 14.) In short, even if Plaintiff could prove that the decision to withhold payment violated Defendant's own internal policies, it would not support an industry standard breach.[3]

Plaintiff's final argument concerning Defendant's failure to pay the $1,500, revolves around Defendant's post-litigation conduct. Plaintiff argues that Defendant has a continued duty to pay under *Fisher,* and its failure to do so constitutes bad faith. (Doc. No. 60 at 6, 8; *State Farm Mut. Auto. Ins. Co. v. Fisher*, 418 P.3d 501 (Colo. 2018).) The argument is unavailing. Plaintiff had the opportunity to conduct discovery on Defendant's post-litigation conduct. (*See* Doc. No. 33 at 8 (finding that in this case, "Defendant admits that it 'obtained additional information about Plaintiff's claimed injuries and employment,' and it 'continues to review information obtained post-suit,' thus "Plaintiff is entitled to know whether that review has been

---

[3] To be clear, the Court is not saying that evidence of internal policy violations is entirely irrelevant to a bad faith analysis, but here there is no indication that a policy violation in and of itself rises to the level of an industry standard breach. Indeed, the evidence demonstrates the opposite.

conducted in good faith and whether Defendant is adhering to its duty of good faith and fair dealing.").) But even after that discovery, Plaintiff never amended her complaint to include bad faith claims based on post-litigation conduct. Nor does Plaintiff rely on any facts (other than inadmissible settlement documents and internal policies that exceed industry standards) to show Defendant's failure to pay post-litigation, was in bad faith. Instead, Plaintiff relies on the same circular argument that the offer itself proves bad faith, which the Court has already rejected.

Next, the Court considers Plaintiff's arguments about the *calculation* of the $1,500 offer. Plaintiff contends Defendant unreasonably calculated the $1,500 sum by using third-party (in other words, adversarial) evaluation standards, rather than first-party standards. (Doc. No. 60 at 12-13.) Plaintiff suggests that use of terms like "offer" shows State Farm treated her claim as adversarial. (Doc. No. 68 at 4; Doc. No. 57-16 ("State Farm is now using language and concepts such as "offer which are taken from a third-party adversarial claims process rather than a first-party claim . . . .").) But Plaintiff cites no legal authority and offers no evidence to suggest that insurers are barred from making offers of settlement in first-party UIM cases. Indeed, settlement is typical and encouraged in the first-party context. *See, e.g.*, *Williams*, 621 Fed. Appx. at 918-21 (considering the reasonableness of a first party settlement offer for UIM benefits); *cf. Bucholtz v. Safeco Ins. Co. of Am.*, 773 P.2d 590, 592 (Colo. App. 1988) (discussing the insurer's duty to negotiate, settle, and pay claims as part of its duty of good faith and fair dealing).[4]

---

[4] Plaintiff's expert, Mr. Strzelec, also opines that State Farm should have given Plaintiff's interest "equal consideration," because that obligation applies in first-party claims. (*See* Strzelec Report, Doc. No. 55-1 at 15, 47-48.) Plaintiff abandoned this argument at the hearing. At any rate, the opinion misstates the legal principles governing first-party claims in Colorado. "[T]he 'equal consideration' standard only applies in third-party bad faith cases, not first-party cases." *Zolman v. Pinnacol Assur.*, 261 P.3d 490, 501 (Colo. App. 2011).

Plaintiff also argues Defendant offered her "settlement value," rather than the "typical jury value" that governs first-party claims, apparently contending this is evidence of bad faith. (Doc. No. 60 at 13.) But Plaintiff does not explain what "typical jury value" would be or how Defendant failed to use it. Moreover, by Plaintiff's own admission, Defendant did indeed use an estimated jury award to calculate its settlement offer. (Doc. No. 60 at 5 ("State Farm created a 'Net Evaluation Range' between $822.23-$17,822.23, which represented what it believed the 'trier of fact might award.'").) This is corroborated by Defendant's offer letter to Plaintiff, which states that non-economic damages are estimated based on "what [State Farm believes] a trier of fact would award." (Doc. No. 57-13 at 1.) In short, Plaintiff's contention that Defendant treated her claim as an adversarial third-party claim is based on her own arguments and conjecture, but unsupported by the record.[5]

## II.   Delays and communication lapses post-UIM claim

Beyond its arguments surrounding the $1,500 offer, Plaintiff contends Defendant's post-UIM claim delays and communications were unreasonable and in bad faith. However, the undisputed timeline betrays this contention.

On June 15, 2023, Plaintiff filed her UIM claim and demanded a response from State Farm by July 14, 2023. (Doc. No. 68 at ¶ 6.) It is undisputed that State Farm was aware of Plaintiff's July 14, 2023 deadline. (*Id.* at ¶ 11; *see* Sawyer Depo., Doc. No. 60-10 at 4.) Two weeks after the June 15, 2023 letter, Mr. Dumong acknowledged Plaintiff's claim and asked her

---

[5] Initially, Plaintiff appeared to challenge Defendant's approach to Dr. Lang's report. However, during the hearing, Plaintiff acknowledged certain errors or gaps in Dr. Lang's report, explained that Dr. Lang would not be testifying at trial, and conceded that Defendant's treatment of Dr. Lang's report was not in bad faith.

to provide higher-resolution copies of some claim documents. (Doc. No. 68 at ¶ 7.) Plaintiff provided that on July 5, 2023. (*Id.* at ¶ 8.) Thereafter, Plaintiff contacted Mr. Dumong and State Farm for updates, without response. (*Id.* at ¶¶ 11, 13.) It turns out Mr. Dumong had to take unexpected leave and was therefore unresponsive to Plaintiff's messages. (*Id.* at ¶ 12.) Defendant did not inform Plaintiff that Mr. Dumong was out of office until July 24, 2023. (*Id.* at ¶ 14.) However, just three days later, Defendant made a settlement offer. (*Id.* at ¶ 20 (offer made on July 27, 2023).) Plaintiff contends this was unreasonable.[6]

Plaintiff correctly notes that reasonableness is ordinarily a question of fact for the jury to decide. *See Zolman*, 261 P.3d at 497. But courts have granted summary judgment where an insurer's conduct was reasonable as a matter of law. *See, e.g.*, *Williams*, 621 F. App'x at 919-20. In *Williams*, the Tenth Circuit considered the reasonableness of a 46-day timeline between the UIM claim and a settlement offer. *Id.* The insurer in *Williams* requested additional documentation during this window, which parallels the communications between Plaintiff and Mr. Dumong on June 30, 2023, regarding higher-resolution claim documents. (*Id.* at 920; *see* Doc. No. 68 at ¶ 7.) The trial court found the 46-day timeline reasonable under the circumstances, and the Tenth Circuit agreed. *Williams*, 621 F. App'x at 920.

Here, Plaintiff's evidence may demonstrate poor customer service, but not bad faith. Not every disagreement or communication lapse between an insured and their insurer gives rise to

---

[6] Plaintiff initially argued that she made a "Time Limit Demand," which triggers certain claims handling procedures that State Farm allegedly failed to follow. (Doc. No. 60 at 9; Doc. No. 68 at ¶¶ 59-61; *see* Doc. No. 60-5 (State Farm document identifying Plaintiff's UIM claim as "Demand Type: Time Limit")). But during the hearing, Plaintiff appeared to abandon her Time Limit Demand argument and instead argued that State Farm's timeline for handling Plaintiff's claim was unreasonable. In any event, the characterization of this as a Time Limit Demand would not change the Court's analysis.

bad faith claims. The conduct here is sufficiently like the conduct in *Williams,* and the 42-day timeline is even shorter than in *Williams.* Moreover, Plaintiff does not offer any other evidence to demonstrate that Defendant's post-UIM claim delays and communications ran afoul of industry standards.

### III. Pre-UIM claim conduct

Plaintiff also argues that Defendant's pre-UIM communications and conduct (which occurred between April and June 2022, and concerned Plaintiff's collision coverage and MedPay claims) contribute to a "pattern of delay and deflection." (Doc. No. 60 at 10-12.) The parties dispute whether this conduct is relevant to Plaintiff's bad faith claims. Defendant argues that Plaintiff's claims concern only her UIM claim, and therefore the Court should consider only the conduct that occurred *after* Plaintiff filed her UIM claim on June 15, 2023. (Doc. No. 57 at 1.) Plaintiff argues that because Defendant's duty of good faith and fair dealing applies throughout the entire insurer-insured relationship, the parties' entire course of dealing is relevant, including communications in 2022.

To establish a statutory bad faith claim, a plaintiff must show the insurer unreasonably delayed or denied payment of a "claim for benefits" to a first-party claimant. Colo. Rev. Stat. § 10-3-1115(1). A delay or denial is unreasonable if the insurer delayed or denied authorizing payment of a "covered benefit" without a reasonable basis. *Id.*; *Fear*, 560 P.3d at 981. In other words, statutory bad faith concerns a specific "*claim*" and "*covered benefit.*" Thus, a delay in

payment can only occur *after* such claim is made and after a coverage determination, making *pre*-claim conduct largely irrelevant.[7]

The calculus on the common law bad faith claim is different. To establish common law bad faith in the first-party context, an insured must prove that (1) the insurer's conduct was unreasonable under the circumstances, and that (2) the insurer knew or recklessly disregarded the fact that its conduct was unreasonable. *Dale v. State Farm Mut. Auto. Ins. Co.,* 699 F. Supp. 3d 1219, 1224 (D. Colo. 2023); *Travelers Ins. Co. v. Savio*, 706 P.2d at 1272, 1275 (Colo. 1985). The duty applies broadly, and courts expressly note that the duty of good faith "continues unabated" throughout the life of the insurer-insured relationship. *Sanderson v. Am. Fam. Mut. Ins. Co.*, 251 P.3d 1213, 1217 (Colo. App. 2010); *Bucholtz*, 773 P.2d at 592. Moreover, here, Plaintiff's common law bad faith claim incorporates allegations of pre-UIM claim conduct (Doc. No. 5 at ¶ 82) and is based on Defendant's refusal "to reasonably communicate," which presumably includes both pre- and post-UIM claim conduct. (*Id.* at ¶ 84.) In other words, in light of the insured's broad duty and Plaintiff's specific allegations supporting the common law bad faith claim, the pre-UIM claim conduct is—at least conceptually—relevant here. Still, it is entirely insufficient.

Mr. Strzelec summarizes Defendant's conduct between April and June 2022 and opines that Defendant unreasonably withheld, and improperly asserted work product privilege over, standard claim documents. (Strzelec Report, Doc. No. 55-1 at 34-39.) But he does not connect

---

[7] In some cases, pre-claim conduct might be relevant to show the insurer obtained certain information that made it unreasonable to withhold or delay payment *after* the claim was filed. But that is not the case here. In this case, Plaintiff expressly declined any UIM claim investigation prior to filing her claim in June 2023. (Doc. No. 68 at ¶¶ 4-5.)

that conduct to specific industry standards, much less explain how Defendant's conduct fell short of such standards. In other words, Mr. Strzelec's opinions are conclusory and do not support a triable issue of fact concerning the reasonableness of Defendant's pre-UIM claim conduct. *See Zolman*, 261 P.3d at 500 (conclusory opinions from an expert do not establish a genuine dispute of fact); *Burke v. State Farm Mut. Auto. Co.*, 2023 WL 4297578, at *3 (D. Colo. June 30, 2023) (conclusory statements based on speculation, conjecture, or subjective belief are not summary judgment evidence).[8]

Because the record taken as a whole would not lead a rational trier of fact to find for Plaintiff on her bad faith claims, there is no genuine issue for trial and Defendant is entitled to summary judgment on the bad faith claims.

## CONCLUSION

For the foregoing reasons, Defendant is entitled to summary judgment on Plaintiff's bad faith claims. Accordingly, the Court **ORDERS** as follows:

1) Defendant's Motion for Summary Judgment on Plaintiff's Third and Fourth Claims for Relief (Doc. No. 57) is **GRANTED.**

2) The Strzelec Motion (Doc. No. 55) is **DENIED AS MOOT WITHOUT PREJUDICE**.

---

[8] Moreover, Plaintiff does not explain how any alleged shortcomings in 2022 caused or contributed to an unreasonable delay or denial of her UIM claim. In fact, Plaintiff emphasizes that she did *not* wish to file a UIM claim in May or June of 2022, and she stands by her decision to preclude Defendant from initiating any UIM claim investigation at that time. (Doc. No. 68 at ¶¶ 4-5.) Thus, while pre-claim conduct could *theoretically* support bad faith claims, it does not support bad faith claims, here.

a. To the extent Plaintiff believes certain portions of Mr. Strzelec's opinions apply to the remaining claims, she shall serve on Defendant a redline version of Mr. Strzelec's report, leaving only those opinions that support the remaining claims. Plaintiff must serve such redline no later than **December 9, 2025**.

b. If Plaintiff serves a redline report, the parties shall, within five (5) business days of the same, file a Joint Status Report (JSR) to update the Court on their respective plans and positions. Specifically, Defendant shall advise whether it seeks to file a renewed 702 motion or address remaining issues, if any, via motion in limine. Plaintiff shall offer her position with respect to the same. The parties may include in the JSR any other information they deem helpful to the Court as it prepares to set trial dates.

Dated this 2nd day of December, 2025.

BY THE COURT:

_____
Maritza Dominguez Braswell
United States Magistrate Judge